On the issues related to approval of the settlement? I think Mr. Sagafi is going to go first on this one. All right, Mr. Sagafi, you may go first. You represent Mr. Lucadano. Yes, Your Honor. Thank you, Your Honor. I represent both Ms. Chen and Mr. Lucadano. May I please the court? Jahan Sagafi for appellants Lucadano and Chen. proposed objectors. I'm going to focus in my 10 minutes on the class action aspects, both the settlement approval and the fees question. And my colleague, Mr. Humanik, will focus on the pocket elements for 10 minutes. And of my 10 minutes, I'd like to reserve four for rebuttal. So the question is, how did this... If I could respond, this is getting complicated. Yes, well, I know I'm responsible for that. So thank you, Your Honor. The question is, how did this deeply discounted settlement come about? And the answer can be found in this court's case law about the heightened scrutiny required for pre-certification settlements, which note various red flags to watch for in a multi-factor analysis. Now, the touchstone for this whole inquiry is the fair, reasonable, and adequate standard and the court's fiduciary duty to the absent class members. And so the task is to determine, as the court in Statton said, if the class members are not being given their due regard. Now, that's a pretty amorphous question, and the analysis needs to be flexible and takes different shapes in different situations. In Statton and Rose, the court has spoken of the inherent, quote, real dangers of plaintiff's lawyers' incentives to pursue their own interests. And so what are those incentives in settlement negotiations that can lead to that? And I think that really takes us back to a foundational concept of the American legal system, which is the adversary system. We rely on parties' adversarial posture to yield the correct answer. We don't have judges deciding cases in a vacuum without parties presenting arguments to them. We don't have a bureaucrat deciding based on their own initiative. We have parties who want to win, motivated by their self-interest, hiring lawyers who want to win, and we rely on their self-interest to motivate them to present the best arguments possible. So in settlement talks, in the traditional bilateral situation of a plaintiff against a defendant, you push for as much as you can, and if the other side won't agree, then you fall back on litigation. And you say, well, we're just going to have to fight it out, and the judge will decide. Now, the problem is, though, what if you can't fall back? So what if, in going back to litigation, as Harvey was faced with the question, you lose the race to another plaintiff because you're four years behind them in building the case? So then your self-interest leads you to accept a subpar settlement because it's better for you than nothing. So any amount of fees at that point becomes a lucrative and attractive option. So the court has instructed district courts to look for these subtle signs that class counsel self-interest has infected the negotiations. And that doesn't mean, as the court in Rose warned in footnote 13, not just actual fraud or collusion or overreaching, but instances of unfairness that may not be apparent on the face of the negotiations, so the surrounding circumstances. And Bluetooth talked about tacitly reducing the overall settlement for a higher fee. It wasn't talking about overlapping litigation like we have here. It was talking about a different context. But I think the same principles very much apply because here our assertion is that Harvey accepted a lower overall settlement for a higher fee, higher than nothing. They could have gotten something in pursuing their Rule 23 claims, which they're entitled to do, but they could not have really gotten anything in the pocket case because they would have had, they never would have caught up to the four years of litigation that our team had invested in that case. And so in Briseno, this court warned that the potential for this collusion is at its apex when plaintiff's counsel has devoted little time and may be willing to cut a low price deal that hurts the class. So that you can call it a reverse auction. You can call it the defendant engaging in plaintiff shopping, choosing which plaintiff to negotiate and agree on the weakest deal. And so that really amounts to a situation that is thankfully unusual, although concerningly, increasingly common, where there's a structural infirmity that leads to a below acceptable settlement. And so this court and the commentators have pointed to various factors, which here the court, the district court failed to address. And so that constituted abuse of discretion in the form of applying the wrong legal standard. And in a few instances. Excuse me, the district court did say in its final order of approval that it was applying the heightened standard and it did note that there was a clear sailing provision. What did it do wrong when it decided that that wasn't sufficient to put this in the realm of potential collusion? Thank you. It failed to look at the at the circumstances that the courts and commentators have pointed to as red flags to address. So overlapping litigation is one of those factors. Negotiating with the weaker plaintiff is another very important factor. Here, the Chen and Lucadano team had gone through many hurdles, 31 motions, 21 depositions, a quarter million pages of documents, defeating summary adjudication and were on the doorstep of trial. The Harvey had done zero formal discovery, gotten 2,000 pages of documents, no depositions, no motion, motion practice, and the court made a factual error that is reversible, calling that in the preliminary approval order, meaningful discovery. And I just want to probe a little more. All of these motions and things, were they about the merits of the actual violation, labor law violations flowing from the use of the AFG program? Some of it was about the merits. A lot of it was the efforts to get the discovery that we needed to get. Some of it was on the merits in the form of a motion to strike by Morgan Stanley, a motion for judgment on the pleadings, as well as the motions for summary adjudication. So, you know, defeating summary judgment is obviously a huge hurdle that plaintiffs don't always survive or don't always even get to. So I think that's your answer. Do you think it shows that your PAGA claim was stronger or weaker, that you had to go through all these hurdles to get to this point where you are on the eve of trial? The PAGA claims were the same. We are asserting the same PAGA claims. We had achieved more in getting to trial because in complex litigation, we have to overcome various hurdles. We have to build a mountain of evidence and we have to present that for summary adjudication and trial. So our posture was much, much stronger because at the beginning of the case, as a plaintiff, I have to recognize I have many hurdles yet to overcome. And so I'm not in a very strong position on day one until I amass that evidence and overcome those hurdles. I thought the PAGA penalties were set by statute. Is that right? Yes, Your Honor. So really, the only question is whether the plaintiffs could prove that there were labor code violations. Is that right? Correct. So I guess I'm not understanding the Harvey plaintiffs established them through settlement, the labor code violations and the penalties were set by statute. So what made your case better or different? Well, to prevail and to get those penalties, we have to win on liability. And so to win on liability, we had to amass evidence and present that to the court to have a fact finder find that Morgan Stanley broke the law. And then at that point, there would be a determination of penalties, both including which labor code claims were successful and whether the penalties should be set at a statutory amount or discretionarily reduced for some reason. But the key question is, how does a plaintiff win? The settlement settled the liability issue. And then the penalties, I understand, were what was set by statute. Is that wrong? Where for the entire period? Correct. OK, I'm sorry. Well, so I guess an analogy would be so I mean, I see a class action. You could do better or worse. But for PACA, with respect to liability or the amount of the damages, but under PACA, there is no such thing because of the statutory penalties are just by statute. So it's hard to see how one claim is better or whether more work matters or not. As long as the liability is determined that the labor code violations occurred. Right. And there was no liability determination here. I'm not sure if I heard you correctly, but obviously in the case of settlement, there's no determination. Yeah, no, in a settlement, there's a concession or at least for purposes of impose. So the whole right and the whole ballgame of these cases rests on can you prove liability, which is an immense task that takes a significant amount of litigation. And then at that point, what's the amount of penalties or damages? And I think the challenge here is that the court did not really engage with the question of how strong these claims were. There was no analysis of that and there was no probing of the limited amount of discovery that Harvey engaged in. So didn't the district court take care of that in its attorney's fees allocation? Because I get the sense that you're arguing that it took four years of litigating against Morgan Stanley and all this discovery for Morgan Stanley to at least possibly internally evaluate its case as they might lose. OK, so you pushed him to four years and like the district court said, he found you were influential and you plowed the ground to get to this point where a settlement could happen. And that's why you got your fees. And so didn't the court take that all into account and what he ultimately did? That's a good question, Your Honor. I think there are two arguments and I'm trying to be cognizant of the time. There are really two arguments. One is that we're saying the settlement is inappropriately low because Harvey was not an adequate bargaining partner that Morgan Stanley chose. So $10 million is not enough money for these claims because 2% of the total value is much worse than the 10 to 50% that was in our chart in our opening brief that we had submitted to the district court. And I recognize that it's incredibly difficult for a judge to assess what's a reasonable discount on a total potential exposure. But at a certain point, these red flags line up and point out the idea that it's inadequate. But taking your question, Judge Wardlaw, assuming that the court affirms the district court and says, yes, this is fair, adequate and reasonable or there is no abuse of discretion by the court, then the question becomes the allocation of fees. And that's a really discretionary question. And yes, the court did take into account the work we perform. Our argument is that the fairest and most rational way of allocating the fees would be by load start. That's when I co-counsel with other lawyers to work on building a case. We usually divide our fees based on the time that we each put in. And so that would have led to a different allocation. But we also recognize that giving a significant fee for a significant amount of work, as the court did, has its merits. And the last thing I'll say about that is that in court, Mr. Wynn at that final approval hearing said, yes, you told us about the 13 percent, 12 percent division of fees. We took a recess. We wanted to talk about possibly settling. And he said, I thought that the allocation, while it wouldn't have been my first choice, was within the realm of reason. And that's the essence of conceding that it was a reasonable fee and not an abuse of discretion. So to the extent the court decides to to affirm the substance of the settlement, we would request that the court either affirm the fee or remand for it to be determined on a load start basis. And if I, I don't know if I have any time for rebuttal. If I, if the court. We get there. Thank you, Your Honor. I know this is a long one, so thank you. So, Mr. Heumann. Good morning again, Your Honors. I'd like to reserve three minutes of my time for rebuttal. Should this court reach the merits, which I don't think it should, the Harvey settlement maneuver demands reversal. False proxy Harvey should never have been permitted to settle PAGA claims that he didn't and couldn't litigate. LWDA's amicus says it did not deputize Harvey to pursue the claims he tried to settle. So he therefore lacked state-sanctioned authority to do so. Harvey, quote, was not in privity with LWDA on the unnoticed claims. Yet the district court allowed Morgan Stanley and Harvey to, with a wink and a nod, add the Chen PAGA claims to the second amended complaint. This entirely warps the incentive that PAGA was intended to create. It rewards the mimic, not the harbinger. We were on the cusp of trial in state court. And here we are with a young class action case in federal court. Yes, you have to make that argument. Can you? I mean, this is we know you can have more than one PAGA lineup and the state can issue more than one assignment. Isn't your best argument that that Harvey had no authority at all from the state to to release those claims because he never got the authority from the state? Yes, I agree with that. The second part of your point there, Your Honor, he never had the authority. And I also would say, I believe it's an open question whether PAGA permits overlapping plaintiffs or multiple plaintiffs. That issue has yet to be addressed in the California Courts of Appeal. And in fact, the Shaw case that we just filed a 28-J on questions whether overlapping plaintiffs are permitted, but assuming they are. This particular overlapping plaintiff, Harvey, went beyond his state sanctioned authority. So if that's the case, then if he has to get from the state, then Morgan Stanley by waiving the statute of limitation or waiving exhaustion just has no power to do that, to affect other people's claims by doing that. Correct. The legislature put the strict administrative exhaustion requirements into the statute to protect the state, the LWDA, and the general public. It was not for Morgan Stanley and Harvey to serve their private interests, the class members' individual interests, to sacrifice the interests of the state and the general public. And that's what the district court failed to appreciate throughout these proceedings. You can go back to the first hearing at intervention, preliminary approval, final approval, and the final approval order. The state's interest is conspicuously absent from being mentioned. The only concern that the district court had was what's in the best interest for the class. And that's fine for the Rule 23 claim, but it does not merit the deference for his separate approval of the PAGA settlement, which is a merits determination and requires district court approval. And he failed to appreciate those interests. Well, he did state that he would take, the judge said he would take care of the state's interests. That was his job to do. And he failed to do that. He failed to examine or consider the perverse incentive that this settlement maneuver creates and how it undermines PAGA enforcement. We don't have to look very far. We see it in this case. You have Brandon Harvey, who confined his PAGA authority to violations occurring during the applicable one-year limitations period. And then knowing that there was a competing, what he calls an overlapping proxy on the eve of state court, he was willing to sell out the state because it benefited him in the class. And that's what the district court failed to appreciate. There were plenty of flags in front of it. The waiver of the defenses, the attempts to silence Chen throughout. There was the MOUs that they wouldn't produce to the state or to the class members. There were mistakes made, $50 million mistakes on the class action claims. I could go on and on. They're listed in our opening brief on the merits. All of the indicia of suspicious activity, whether you want to call it collusion or constructive evidence, it's always going to be circumstantial evidence. But that was what was here. And we didn't have to go farther than we know that if Morgan Stanley had moved to dismiss a plaintiff's claim under PAGA, who was trying to get a five-year statute of limitations, that would have been granted out of hand. But the district court said, oh, that's okay because we're settling a class action claim. And that was the abuse of discretion. They just did not, the district court just did not consider effective enforcement of and how that perverse incentive of allowing an overlapping plaintiff, especially one four years behind Chen, who was already on the eve of trial. I have the same question I had for your co-counsel. On the PAGA claim, had Chen been doing it that they didn't get in the settlement on the PAGA claim? Well, yes, your honor, there's a big difference because PAGA, Chen had been deputized to pursue the Chen claim. I'm sorry, you cut out. Could you please repeat that question? You're cutting out so we can't hear your full question. I was asking what the state lost in the way of penalties or otherwise that your client that Chen would have gotten. Well, because in this settlement, Mr. Harvey settled this penalty claims for $600,000. We believe that they were worth much, much larger than that. And that's outlined in my declaration as to what the exposure potential is. And that's because Chen had timely claims. Harvey did not. So Chen's PAGA period goes all the way back to April of 2013. So she was uniquely situated to be able to collect PAGA penalties for violations going all the way back to April 2013. Harvey, on the other hand, if this was actively and adversarial litigated, he could only go back to May of 2017. So there's a lot of settlement. They went back to 2014. So was the settlement for less than the statutory amount? Far less. The statutory availability of penalties under PAGA, especially because one of our theories allows for a 25% underpaid wage component. And that's the whole thing about AFT, is it's really stealing wages from the financial advisors. So if the total AFG exposure, let's call it 250 million, under PAGA, it's not just $100 per pay period. It's 25% of the amount wrongfully withheld. So that's 50 plus million, yeah, 70 million, 60 million. In additional PAGA penalties, you can get beyond $100 per pay period. So it was enormous what the differences were between having Chen as the proxy versus Harvey. Go on. Okay, so that was the mistake is that the district court was viewing PAGA as a mini class action. It's not a mini class action. This court is told, federal courts and state courts alike,  They serve different purposes, public and private. But the district court below treated it as a mini class action. And that's the abuse of discretion. And it should never have been allowed. And if there were any hesitation at all about these myriad of legal questions, we moved to certify four of them, which we think are ripe for determination by the California Supreme Court. Because this issue of overlapping proxies continues to recur. There's no clear guidance from the California Supreme Court, none at all. And even the California Courts of Appeal have not addressed the issues that Chen has raised, specifically regarding not only scope of authority, but whether a first filed PAGA plaintiff actually trumps all others because of that complete assignment. And because of the primary rights theory that the state can only vindicate a primary right through one action. It can't have multiple actions. That's one of our arguments and no court in California has addressed that. So that's an additional basis for certifying questions. So with that, I would like to possibly, if I can, reserve some time for rebuttal. All right. Okay, so who is going first this round? Harvey or Morgan Stanley? Okay. Thank you. And Judge Wardlaw, I will get to the questions you asked about that first year. But let me take this step by step to keep everything clear. Let's focus first on Ms. Chen and the arguments that Mr. Humanik just made. Under Saucio, Ms. Chen has no standing to present any of those arguments to this court unless the court reverses Judge Oreck's denial of her motion to intervene under Rule 24A. Saucio was as clear as could be a non-party, even a party that has been deputized by the LWDA to pursue a PAGA claim cannot pursue an appeal from a PAGA settlement because that individual is not a party. And that is consistent with well-established Ninth Circuit case law. It's consistent with Federal of Appellate Procedure 3C1A.  Now, Mr. Humanik made a new argument as to why Ms. Chen supposedly should have been granted Rule 24A intervention saying that she was automatically entitled to intervene under Rule 24A because she's standing in the shoes of the LWDA. But as I pointed out, the LWDA has to satisfy the same requirements for Rule 24A as anyone else. And if Mr. Humanik were right, then the district courts would have to grant intervention of every single aggrieved employee in every single PAGA case that claims that they're standing in the shoes of the LWDA. That's not the law. The only people permitted to intervene are those who satisfy the three requirements of Rule 24A. And it doesn't include someone like Ms. Chen, who, as Judge Oreck pointed out in his decision, his final approval at Note 5 and his preliminary approval at Note 6. Ms. Chen was now interminated, but she was banned for life from working in the United States. Ms. Chen submitted her expense reports under this AFG program. So he had ample discretion to deny her intervention. So threshold, no intervention, no right to appeal. Okay, let's assume that Ms. Chen is somehow able to get over that initial burden. The question is, was Judge Oreck within his discretion in approving the PAGA settlement? There's no question that he applied the correct standard. He said all the right things in his preliminary approval order and his final approval order. The only substantive argument that I've heard, and it wasn't presented to Judge Oreck this way, but it was really the argument that was embedded in the question that Judge Wardlaw asked. So let me go right to that. Did Judge Oreck have discretion to approve a PAGA settlement that included that first year of PAGA penalties for which Judge Oreck approved a settlement of $500,000, which was certainly fair for that period of time? Did he have discretion to do that given that the statute of limitations on Mr. Harvey's claim had there been no earlier Chen claim would not have covered that year? And the answer under PAGA is yes, of course he had that discretion because the statute of limitations under PAGA is not jurisdictional. And we know that because the California courts, which are the courts charged with construing their own state statute, have expressly held that the statute of limitations period under PAGA is waivable and is not jurisdictional. And they've done that in two separate contexts. They've done that in the case that I think Judge Ikuda referred to earlier, the Amaro case, which involved this precise situation where you have two plaintiffs, both deputized by the LWDA to pursue a PAGA claim. One settles. The other challenges the settlement, including on the ground that the second defile hadn't been deputized for that earlier period. And the courts in Amaro said, it doesn't matter. That's waivable by the defendant just as non-jurisdictional, non-statute of repose, statutes of limitation can always be waived by a defendant in settlement. And second, the courts did it in a series of cases involving the relation back doctrine, including most recently the Hutchinson case, 74 Calab 5th 932, earlier this year. So there is no jurist, nothing in the PAGA statute. In fact, PAGA doesn't even set forth a one-year limitations period. The only reason there's a one-year limitations period in PAGA is because PAGA says nothing about the statute of limitations. So you borrow the default limitations period under California Civil Procedure Code Section 340A, which applies in cases of statutory penalties. So yes, Judge Oreck was well within his discretion in approving the PAGA settlement and deciding that it was fair on the facts of the case, looking at the settlement as a whole, which a district judge is required to do in determining whether it's fair, adequate, and reasonable. So Amaro is a court of appeals case from the fourth district. Has the Supreme Court addressed that issue? No. No, there are no cases going the other way. That was my next question. Sorry. There are no cases going the way, and the relation back cases are consistent, and the language of the statute is consistent, and the underlying policies. I mean, the point of PAGA is to enhance labor code enforcement. And so you have to give the LWDA the opportunity to decide whether to investigate and file a complaint itself. That happened here. Ms. Chen filed her earlier notice. LWDA looked into it. LWDA said, fine, we've conducted the investigation. We're not going to do it ourselves. But it authorized the case to proceed. And the fact that it authorized one plaintiff and then another plaintiff, the California Courts of Appeals said, doesn't make any difference. Either plaintiff can settle that. In fact, it's a practical matter. The only reason they're only going to be able to get a settlement with some defendants if they settle the whole thing. But there's no jurisdictional bar. And that's the issue before the court. What about the Trireta case that the California Supreme Court is taking up? Should we defer submission pending that decision? Or is that decision going to reach this issue? No, not this issue. No, Trireta, I haven't talked about Trireta because we don't know what the California Supreme Court's going to do. But Trireta can't undercut our argument. It can only enhance our argument. Trireta said that a protesting, objecting PAGA plaintiff has no interest whatsoever, no protectable interest, cannot intervene, has no rights at all. That opinion was not depublished, which the California Supreme Court can do, meaning it is still the law in California, although there is a conflict there. But no, you don't have to decide whether there is a protectable interest. Whether Trireta is right or wrong to affirm the discretionary denial of the motion to intervene because Chen was allowed to have her say, because her claim was questionable, and for all the other reasons I set forth. Whatever interest she had, or the LWDA had, was adequately presented. Then there were the timing issues, as you pointed out, Judge Bade, which would be an independent reason for the judge's discretion. But no. And class action plaintiffs, because this is a settlement. You might have to reach the protectable interest issue if this case were being litigated. But because it's a settlement, it doesn't even matter whether there was Article III jurisdiction over the PACA claim, or whether Harvey had standing, because he unquestionably had standing to pursue the labor code claims that are at the core of the labor code settlement. So Judge Oreck had ample discretion to exercise supplemental jurisdiction for purposes of approving the settlement. So you don't have to reach the Trireta conflict. So what do we do with TransUnion? And the requirement that each plaintiff has to have standing. So it seems from the record that some of these plaintiffs did not participate in the AFG program. Sure. Okay. That's it. That's I understand. Okay. That's a different issue that was in the briefs, but not argued. But of course, this settlement is not limited to the AFG program. This settlement focuses on Section 2802 of the labor code, which involved unreimbursed business expenses, not just in the AFG program, but overall. And that's one of the reasons that the settlement is done on a pay period by pay period basis. Every class member has a failure to reimburse business expenses claim, even those that did not participate or qualify for the AFG program. So there's no TransUnion issue in this case. District court determined damages on a 10-year basis, how long they've been employed. Did the district court determine at the settlement that each of the members of the class had actually been injured one or more of the labor code violations? There was no challenge by any objector to that. The district court did determine and was explicit that the plan of allocation was appropriate because in addition to the AFG, there were all these other business expense claims that were asserted in the case. And neither the defendant, Morgan Stanley, nor the objectors disputed that all class members in fact did suffer the sorts of injuries that were redressed by the settlement agreement. So there's no evidence of any uninjured plaintiff. And of course, the complaint alleges that everyone was injured and that's sufficient for purposes of standing and class action standing. And if I may turn to the arguments Mr. Sagafe raised, most of which talk about game theory in a more theoretical case, but let me focus particularly on the issues presented here. Judge Orr went through in considerable detail explaining, responding to each of the arguments that were asserted by Mr. Lucadano, but also pointed out that there were significant problems with Ms. Chen and whether she would be able to effectively present these cases going forward. Recall that in the state court proceedings that Ms. Chen filed in Orange County, the trial that her counsel was leading up to was just a phase one trial to determine whether she, not Mr. Lucadano, because Mr. Lucadano did not have a PAGA claim as we discussed, whether Ms. Chen is an aggrieved employee who is permitted to pursue those PAGA claims. Recall as well that there is that threshold disability that Ms. Chen fraudulently claimed expenses under the AFG program and therefore was banned from the securities industry for life. So we don't know whether she would have made it through phase one at all. Even if she had though, as Judge Orr pointed out, there was no plan in place for phase two, which is determining who else may have been an aggrieved employee, how broadly these violations occurred. There were years of litigation yet to be pursued and no evidence at all as to what the outcome was or whether they would be manageable. The question was raised and under the new authority that Mr. Lucadano and Ms. Chen presented, Estrada, manageability can be considered. Again, this is a case that the California Supreme Court has not yet addressed, but it's a factor to be considered in determining whether a settlement resolving claims now, getting money to the class members now is fair and reasonable. There's no question that Judge Orr stated the correct standard. There's no question that this appellate review standard is a strong showing that the district court's decision was a clear abuse of discretion considering the fairness of the settlement as a whole rather than each component part. Only seven of the 3,300 class members opted out. There was only one objector who was a member of the class. That's Mr. Lucadano because Ms. Chen isn't even a member of the class because she was terminated before the class period began. Judge Orr carefully went through all the factors evaluating the risk, expense, complexity, likely duration of future litigation, the posture of the Chen phase one and phase two, explained why the section 2802 claim, the parallel being the 221 claim, was the driver of the case. Um, what the difficulties were with certain claims, the fact that there were all of these arbitration agreements that many class members had signed releases. Um, uh, he went through, I won't go through everything that's in the briefs, go on and on, but, but every single point, not only do we address in the briefs, but more importantly, Judge Orr took into consideration before he concluded that this settlement was fair, reasonable and adequate and in the best interest of the class. Uh, and, and that was not even close to an abuse of discretion. The only other point I think that I need to respond to is the suggestion that his finding, he did find it was in the reverse auction. He did find that this was comparable to the other settlements and explained the data. Why? Um, the only argument that I just heard was that it was that's ER 31 to 32, but then he went on to explain that that discovery included, and I won't, I won't list it all. Um, but, uh, he went through paragraph after paragraph of what that discovery was and all the data, everything that was needed to evaluate this case was presented to Harvey counsel. As he noted, Harvey's counsel, Mr. Wynn and Mr. Clapp are very experienced, highly competent class action counsel who specialize in cases like this, that's in case the principal comparator was their case. Uh, and Judge Orr, who is in a better position than any of us to evaluate the strength of their case, the strength of the Chen case, what was going to happen to the class, what the possible defenses were. Um, uh, his findings are fully supported by the evidence well within the discretion that he had and whether or not Ms. Chen is permitted to appeal her challenges to the PAGA portion of the settlement. Um, and we believe that she isn't because intervention was properly denied, uh, certainly acted within the scope of his discretion. So Mr. Lucadano's challenges to the labor code component, because again, under Saucillo, he is not permitted to challenge any of the PAGA component because he has no PAGA claim because he never filed a PAGA notice and was never authorized to do anything by the state. Um, but his challenges to the labor code component of the settlement should be rejected because Judge Orr acted well within his discretion. Is Lucadano an aggrieved party under PAGA? No. Uh, oh, is he an aggrieved party under PAGA? I'm sorry. Um, uh, yes, yes, he worked during part of the time covered by the PAGA claim. So he is one of the thousands of aggrieved employees, but no one contends that being an aggrieved employee is enough to entitle you to seek intervention or seek to appeal. Everyone agrees that the question is whether someone who has been expressly delegated authority by the LWDA should be permitted to intervene or should be permitted to appeal. So the fact that he is an aggrieved employee doesn't give him any rights and Saucillo and a dozen California state cases hold that. And with that, I think I will turn it over to Mr. Livingston unless the panel has further questions for me. Is Mr. Wynn going? Mr. Wynn is going to argue the fees issues and I think he'll argue in the fourth appeal and I think that's after Mr. Livingston, uh, argues as to the, the next two of these three combined appeals. Okay. Um, then Mr. Livingston. Thank you, your honor. And I'm going to apologize in advance. As luck would have it, there's a window washer outside my conference room where I'm working. This is worse than my cat at home. So I want to follow up on just a couple of points that were made along the way. And particularly with respect to the right for Ms. Chen to appeal. And I want to head off an argument that I imagine is going to come up in rebuttal. And that has to do with Saucillo's reference to exceptional circumstances. Granted that is a possibility for a person or an entity to have the right to, uh, and get standing to appeal, but it does not exist here and it does work in favor of Ms. Chen. That situation is usually where a party has been dragged into court against their will and where they have been forced to have a judgment imposed against them, against their will. And under those types of circumstances, and I'm talking about the Volkoff case and the standards announced in that case and discussed in that case, it would be unfair or inequitable to not allow the person to stand up and to make arguments in the appeal itself. That is not the situation with Ms. Chen. She was not forced to come into this case. She was not invited to be part of this case. And she was actually not deprived of any opportunity to make any presentation. But most importantly, she's not being subjected to any judgment. It is not a judgment against her. This settlement does not cut off any claim that she could have had personally under the labor code, because that's not how PAGO works. It cuts off the state's ability to prosecute future labor code claims based on the same conduct. It doesn't cut off Ms. Chen's opportunity if she had one to litigate any labor code claims themselves. And so the exceptional circumstances doctrine would not apply here. This is a completely different case, for instance, than the SEC versus Wenke situation, where a receiver pulled a party into court, and then there's a judgment entered against that party. I want to talk also about this concept that Harvey adopted Ms. Chen's letter. And it goes back to the rights of Morgan Stanley, which is why I wanted to address this. There was no obligation requirement, or in fact, an adoption of Ms. Chen's letter by Mr. Harvey. It was simply unnecessary. And the courts heard lots of argument about the Amaro case, focused on time periods. The courts heard some argument about Moniz, which allows releases of claims that are based on the same set of facts, even if not give power to Morgan Stanley to waive its affirmative defenses, and to allow a settlement to occur that goes back further in time, or maybe covers a broader set of claims than was in an original letter. But those cases are not what the settlement was actually based on, because they didn't exist at the time of the settlement itself. The Villa Cruz case is the case that we relied upon, that has been out there for over 10 years, that gives a party such as Morgan Stanley, the right to waive its affirmative defense as to statute of limitations, and as to exhaustion. And that's exactly what happened here. Amaro simply built on that law, and the same is true for Moniz. One quick point that is worth noting, and that is the whole exhaustion argument, and of the state of California, and then the general public, is not exactly quite right. There is a benefit to the state of California, they're given a chance to investigate. They did not investigate, we know that. In fact, from 2014 through 2020, the LWDA did nothing in connection with this case, despite getting two different PAGA letters, despite getting notice of the settlement, despite getting copies of the briefs before the district court, it did nothing. But importantly, what the Brown case said, the Supreme Court case, California Supreme Court and Brown, was that this PAGA notice was also to benefit the employer, so that the employer was put on notice of the types of claims against it. And that's exactly what happened. Morgan Stanley knew about the types of claims against it from the Chen letter, the state knew that as well, and so those, the public policy considerations were completely satisfied. And then statute of limitations and exhaustion can be waived as a matter of an affirmative defense. And so this whole concept that somehow someone took Chen's right, it just doesn't exist, and it's not consistent with a quite broad body of case law. And one important point as well, your honors, is that the Amaro case, the Supreme Court had a chance to consider that and to review it if it wanted, but the Supreme Court denied review of that case at the end of 2021. And so it chose not to proceed down this path. There's been lots of discussion about Chen, the case itself, and where it was, and how it was on the brink of some sort of victory, and certainly delivering some sort of huge benefit. That is not what Judge Oreck found. And frankly, that's not what the trial judge in Chen, and this is in the record, said that, in fact, the Harvey case might provide more benefit and sooner benefit to the class and agreed employees than the Chen case ever could. And why is that? Because after four years, including mediation sessions and discussions with mediators along the way, the Chen case was not even close to being resolved. As Mr. Rubin said, it was on the brink of a two-person trial to determine whether they were aggrieved or not. And there were huge headwinds that they were facing. It is true that summary adjudication was denied against Morgan Stanley. It was also denied against Ms. Chen. The court basically said, yeah, there are issues here that we need to look at, and we'll do that in a trial. We're not going to resolve that on a motion basis. And so the impact of that was that after four years, Chen was going nowhere. It was adrift, as Judge Oreck referenced, and it was not on the brink of delivering anything of significant value. And there were real challenges that the Chen case was facing. Mr. Rubin talked about Ms. Chen and her personal issues. She also was in the pocket period for only two pay periods. Mr. Lucadano, for his part, he was a low revenue producer. He came very late to the game. He did not have his own pocket letter, and he only had about $800 in AFG. There were serious issues that we believe could be raised at the two-person trial that would derail this entire case. And as Mr. Rubin said, even if somehow these two individuals passed muster and were deemed to be aggrieved employees, there was a whole world of pocket coming ahead. They had not yet decided how that would work, whether it would be manageable, which is still an issue. The Wesson v. Staples case is out there and says that manageability is an important issue. And it's particularly important when you're looking at a pocket claim like this, which is based on how individuals use an AFG program, which was different and submitted and received reimbursement for ordinary business expenses. Those are uniquely unmanageable issues. And that was part of the challenge that was coming for the Chen case. So the idea that there was a brink of delivering a $50 million or $30 million or $2 million victory to the aggrieved employees, there's no support for that. In fact, there's no support in the of the pocket penalties, simply not there. And any points that Mr. Humanic raised on this issue, we rebutted one by one in our papers. I want to talk just very quickly. You clarify on the response to the trans union issue. I heard Mr. Rubin say that the settlement is not limited to the people who participated in the AFG program, but it is limited to time and they had to be a financial advisor. What are the other claims where these financial advisors were injured? So your honor, I'll use Mr. Lucadano as an example. I took his deposition. He claimed that he had business expenses in the ordinary course of his work as an investment broker, as an FA, and that they were not reimbursed. And so claims like that would theoretically exist. And the allegations were that they existed for each of the class numbers. And as a result, we don't believe, as Mr. Rubin does not believe that trans union gets in the way. And in fact, as Mr. Rubin said, this is exactly why the allocation was the way it was. It was done on a pay period basis, as opposed to doing it on a amount of money contributed to AFG basis, because the parties wanted to ensure that they were giving effect to all of the different claims that were out there, including the 2802 claims for failure to reimburse business expenses. So the claim is that the allegation is that Morgan Stanley failed to reimburse necessary ordinary business expenses, and that violates a section of the California labor code? That's correct, your honor. Is there any requirement that anybody showed that they actually didn't have their expenses reimbursed? Not in a pre-certification settlement situation, which also distinguishes us from trans union. We're in a world pre-certification where the parties have agreed to resolve, of course, so that they don't have to go through the process, a very expensive process of litigating further. The case was not certified. As a result, there is not that evidence, but it's not required. This in case is a perfect example of settlement. In that case, there may or may not have been some individuals who did not have business expenses, but given the posture of that case, as with the posture of this case, it's appropriate to settle at that point without having that individualized showing for each and every single class member. The pre-certification settlement makes all the difference. You're relying on the allegations, your honor, and the allegations here are exactly as you described. There's an additional twist, of course, having to do with AFG, which is really, I was forced to put money into AFG to pay for my expenses instead of them covering it, but it's just a twist on the same basic claim under labor code section 22. I know I've gone past my time a bit. I just wanted to make one last comment about reverse auction, if I may. Judge Oreck looked at this extremely closely. He had every opportunity to hear from Chen and from Lucadano about whether this was a approval order. I believe it was nine times about how he was applying scrutiny, and he concluded that this was an appropriate settlement. There is absolutely no abuse of discretion here. Not a single one of the arguments made today or in the appellate briefs regarding the concept of a reverse auction was not presented clearly at least once, if not twice, before Judge Oreck. Amara warns what happens in situations like this. It is just the reality that there are multiple pocket cases going on at the same time, and there's always going to be someone who's upset when one case settles, and it covers off another case, but Amara's warning seems really prescient under the circumstances. What the court said there was there will inevitably be plaintiffs with unreasonable assessments of the merits of their claims or unrealistic damage valuations that would thwart reasonable settlement offers. In such a case, a defendant would be unable to reach a global settlement with a reasonable plaintiff without being accused of engaging in a reverse auction, and that's exactly where we are right now. And if there are no other questions, thank you, Your Honors. Right, thank you. I believe Mr. Wynn is next. Yes, good afternoon, Your Honors. May it please the court, Ed Wynn for Plaintiff Harvey on the attorney's fee appeal. The district court's fee award was certainly within the realm of reason in the context of settlement, but this was no settlement. A fee award and a class action can only be awarded if a party has substantially benefited the class or materially benefited the class, not as been defined as one where they have created, increased, protected, or preserved the fund. Is that a flexible standard? Sure, but it's within those broad parameters. A mere incidental benefit is not sufficient. We are aware of no case, and the Chen plaintiffs have not cited any, where an objector has been awarded fees where they did not provide a benefit to the class that served to create, increase, preserve, or protect the fund. Here, the court did not find, nor do the Chen plaintiffs claim, that they met this standard. Indeed, all the actions the Chen plaintiffs have taken have been to destroy the fund. Rather, the district court based its fee award on a finding that the Chen plaintiffs had plowed the ground. For their part, the Chen plaintiffs argue that they're entitled to fees because they litigated to the eve of trial and had a longer statute of limitations. But litigating for any amount of time is irrelevant if that litigation did not produce results. Quote, plaintiffs' attorneys don't get paid simply for working, they get paid for obtaining results. That's the inkjet printer Likewise, having a longer statute of limitations is not a substantial benefit for the class. That's the heritage bond fund case. The court's finding that the Chen plaintiffs had plowed the ground boils down to a single word, motivation. This is not and cannot be the standard for award of fees. The standard of substantially or materially benefiting the class is one that is objective. It is quantifiable. It is verifiable. It is not subjective, ephemeral, or incapable of being verified, which is precisely what motivation is. The consequence of a subjective standard, such as the one the court employed here, is disastrous because it would result in, number one, a Malthusian proliferation of all fee awards from review. Moreover, there is no evidence that the Chen plaintiffs actually motivated the defendant to settle. Indeed, the only evidence in the record is directly contrary to that contention. Defendants stated that he was indeed not motivated to settle by anything that Chen did or didn't do. Thank you, your honor. Your honors. Thank you. Okay, so let's see. Mr. Taghafi, a couple minutes for rebuttal. And Mr. Humanik, a couple minutes for rebuttal. Thank you. I'll defer to Mr. Humanik to go first, if that's okay. All right. Thank you, your honor. I'm going to start with the Lakers and just show how their tortured reliance on it is indefensible. The plaintiff in the Lakers was a class member in the prior lawsuit that settled. Here, they defined the class to exclude Chen's membership. So the reason why it was res judicata against the plaintiff in the Lakers is because he sat on his hands in the earlier class action, did not object, did not intervene, did not appeal, and did not opt out. He took all the benefits of the class settlement. And that's why it was binding on him. And here, they intentionally excluded Chen, so she couldn't do any of those four avenues. So that's just incorrect. And that's the difference between a contract bar and a judgment bar. I want to touch base on Amaro real quick. Three days after Amaro came out, Uribe came out. Uribe disagrees with the fundamental notion that a positive plaintiff can release unexhausted claims. And by any definition, releasing claims outside of your one-year applicable statute of limitations is releasing unexhausted claims. So you had no basis to sue on that. And the district court has no basis to issue a judgment on those unexhausted claims. And again, that is why we're requesting certification. And there was no mention by There is nothing that says overlapping plaintiffs are allowed or that the second or third plaintiff can somehow come in and settle the claims of the first filed plaintiff. In fact, the primary rights theory suggests strongly that the first filed PAGA plaintiff has exclusive control because he received a complete assignment, just like Magadi. As far as what's in the record, look at Ms. in the district court. She marshals all of the evidence in district court opinions. That was well before Judge Orrick. Everyone knew that this was just to check a box so that the five-year trial period didn't expire. We had already overcome summary judgment and had shown that we were going to establish liability. And the next phase was going to come right after it to just excuse me, the penalties as Judge Ikuda referenced. It was just going to be a mechanical part of the trial. How many labor code violations were there? And then calculate the statistical evidence. So it wasn't this long drawn out proceedings that Mr. Livingston and Mr. Rubin just, it's just inaccurate and it can't be squared with Judge Claster's own words. So I would encourage the court to readjust Judge Claster's rulings on these matters. So with that, I would say in closing, PAGA claims belong to the state. They're the sole real party in interest to them. And PAGA claims belong in state court too. And if there's any question about that, this court should certify our questions to the California Supreme Court. This court should reverse the judgment. It should vacate the September 5, 2019 order denying intervention and remand with instructions to dismiss the PAGA claim for lack of subject matter jurisdiction. Alternatively, it should vacate the September 5, 2019 order denying intervention and grant it to the one true proxy, Tracy Chen. And if there are any additional questions, I'm happy to answer them. Thank you. Your honors, if I may take my time just for a couple minutes respectfully. Thank you. So I'll focus on the fees question that Mr. Wynn was arguing. And I think he got this standard almost correct. It's true that an objector can get a fee for increasing a fund and also a fee for a substantial benefit to the class members. And obviously, that's the prong that Judge Orrick rested his analysis on. First, Mr. Wynn and Mr. Harvey waived his right to challenge the fee by saying that it's within the realm of reason. That wasn't just accidentally blurted out. That was after a 10-minute recess. He came back and said that it's reasonable, but I'd like to discuss both parties dropping their appeals. We didn't decide to do that. Secondly, the court in its broad discretion entered a Solomonic order that gave both of us less than what we wanted. Harvey's counsel is getting a 1.8 times multiplier on their fees. So they're getting about $1,500 an hour for their partner time. We're getting a 20% of our hourly rates based on the work that we perform. Obviously, we're disappointed. Obviously, they're disappointed, but Judge Orrick was well within his discretion to grant that award. And in terms of objective evidence that we did provide a substantial benefit to the PAGA members and by extension, as well, the class members, Judge Orrick properly relied on the fact that the Harvey settlement explicitly refers to CHEN in various places. It talks about the CHEN-only limitations period. It overpays for that CHEN-only period by allocating $500,000 for one year of time, the CHEN-only period in the Harvey settlement's words, versus $100,000 for the remaining four years. So it paid 20 times as much for the CHEN-only period. So those are some of the facts in addition to all the litigation pressure that properly allowed Judge Orrick to find that ground and quote, unquote, provided a significant benefit. I am happy to conclude in two sentences. If the court is willing, I had one quick response to Judge Bates' question about timeliness on intervention, if I could stay for 30 seconds. Great. Thank you. I did want to just address that question because I think we have a very strong answer, which is we became aware of the Harvey settlement in mid-December. We brought our intervention motion in mid-January. So I remember vividly the day that Mr. Wynn called me up and said, I'm happy to announce that we settled our case and I'm happy to announce that we settled your case as well. And the feeling in my stomach when I learned that, and we immediately got to work on the intervention briefing and filed it a month later. So that's about as quick as it can happen over the holiday break. So I did want to that fact. But in conclusion, we do respectfully request that the court reverse settlement approval with instructions for Judge Orrick to allow all three plaintiffs, Chen, Lupagano, and Harvey to work together to secure the best possible settlement on behalf of the class members and aggrieved employees, recognizing that Harvey cannot settle Chen's target claims. In the alternative, if the court does choose to affirm the settlement approval, the court should either the fee with instructions to award based on Lodestar or simply affirm the fee order. Thank you, Your Honors. All right. Thank you, counsel. Appeals number 19-169-55-20-15509, 21-55-10, and 21-55-48 will be submitted. And this session of the court is adjourned for today.
judges: WARDLAW, IKUTA, BADE